

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

---

**NO. 2-07-234-CR**

---

JOSHUA DALLAS WHITE                                        APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

FROM COUNTY CRIMINAL COURT NO. 5 OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant Joshua Dallas White pled nolo contendere to and was convicted

of driving while intoxicated (DWI) but reserved his right to appeal the trial

court's denial of his motion to suppress.  Because we hold that the trial court

erred by denying Appellant's motion to suppress, we reverse the trial court's

judgment.

---

[1] *See* TEX. R. APP. P. 47.4.

On May 24, 2006, Police Officer Kelly Nichols stopped Appellant in The Colony, Texas, and, based on the stop, arrested him for DWI. On June 29, 2006, Appellant was charged by information with DWI. Appellant filed a motion to suppress the evidence based on the stop.

At the hearing on Appellant's motion, Nichols testified that while on duty on May 24, 2006, around 1:22 a.m., she observed Appellant driving below the legal speed limit on FM 423 on the south side of The Colony. Nichols observed Appellant drift within his lane and make two sudden lane changes, using his turn signal each time. After observing Appellant for two-to-three hundred yards, Nichols turned on her in-car camera. She saw Appellant's vehicle cross a yellow line separating the lane from the shoulder. She further observed the tires of his car hit (but not cross) the road's center line "every once in a while."

Nichols noticed that Appellant had made a number of left turns, and in her opinion he appeared to be driving in a circle. She testified that depending on the situation, a person making a block is suspicious. Based on her observations, she decided that she "needed to go ahead and make a traffic stop to check the welfare of the driver of the vehicle and make sure that everything was okay with the driver, whether he was intoxicated or a medical problem that he was having or something like that at the time."

Additionally, we have carefully reviewed the videotape from the in-car camera. The tape clarifies the circumstances of the stop. When Nichols approached Appellant's car, she did not ask if he needed assistance. Instead, she told him that he had been swerving in and out of lanes and asked, "Do you have any explanation?" She did not ask if he was ill, but immediately asked if he had been drinking. In observing the progress of Appellant's car, we note that it was not swerving in and out of lanes, was not going particularly slowly, and was maintaining a single lane except for signaled lane changes.

The trial court denied the motion to suppress, and Appellant entered a plea of nolo contendere pursuant to a plea bargain. The trial court convicted Appellant and sentenced him to seventy days in jail. Appellant timely appealed.

In a single issue, Appellant argues that the trial court erred by finding that his detention was properly supported by the evidence and, therefore, denying his motion to suppress. The State argues that the evidence shows that Nichols could have reasonably initiated the stop of Appellant's car for suspicion of criminal activity, specifically DWI, or to exercise the police's community caretaking function and that the traffic stop was proper under either theory. The trial court entered no findings of fact or conclusions of law.

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on

specific, articulable facts.[2] An officer conducts a lawful temporary detention when he or she has reasonable suspicion to believe that an individual is violating the law.[3] Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity.[4] This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists.[5]

The phrase "totality of the circumstances" also applies to the determination of the propriety of a stop based on the community caretaking function.[6] In *Corbin v. State*, the Texas Court of Criminal Appeals explained,

> . . . . Whether a stop is reasonable depends on "a balance between the public interest and the individual's right to personal security free from arbitrary interference by law enforcement." A

---

[2] *Terry v. Ohio*, 392 U.S. 1, 22, 88 S. Ct. 1868, 1880 (1968); *Carmouche v. State*, 10 S.W.3d 323, 327–28 (Tex. Crim. App. 2000).

[3] *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

[4] *Id*. at 492–93.

[5] *Id*. at 492.

[6] *Corbin v. State*, 85 S.W.3d 272, 276 (Tex. Crim. App. 2002).

seizure based on reasonable suspicion or probable cause will generally be reasonable.

But even without reasonable suspicion or probable cause that an offense has been committed, a police officer may reasonably seize an individual through the exercise of his community caretaking function.

. . . . As part of an officer's duty to "serve and protect," an officer "may stop and assist an individual whom a reasonable person, given the totality of the circumstances, would believe is in need of help." The community caretaking function, however, is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." As a result, a police officer may not properly invoke his community care taking function if he is primarily motivated by a non-community care taking purpose. . . . "[W]e must determine if [the officer] acted reasonably when he stopped the vehicle *out of concern for the welfare of appellant*." . . . Professor Lafave explains, "[I]t apparently remains open to defendants whenever the challenged seizure or search is permitted without probable cause because of the special purpose being served, to establish a Fourth Amendment violation by showing the action was in fact undertaken for some other purpose."[7]

The *Corbin* court explained that when the record reflects that the officer was concerned that the defendant was tired but was also concerned that the defendant might be drunk, the trial court, as the exclusive judge of credibility and finder of fact, could properly conclude that the officer was primarily motivated by community caretaking concerns.[8] The *Corbin* court then

---

[7] *Id.* at 276–77 (citations omitted).

[8] *Id.* at 277.

explained how to decide whether an officer's belief that an appellant needed help was reasonable:

> Once it is determined that the officer is primarily motivated by his community caretaking function, it must then be determined whether the officer's belief that the defendant need[ed] help [was] reasonable. In evaluating whether an officer reasonably believe[d] that a person need[ed] help, courts may look to a list of four non-exclusive factors: (1) the nature and level of the distress exhibited by the individual; (2) the location of the individual; (3) whether or not the individual was alone and/or had access to assistance other than that offered by the officer; and (4) to what extent the individual, if not assisted, presented a danger to himself or others.
>
> Because the purpose of the community caretaking exception is to allow an officer to "seize" and assist an individual whom he reasonably believes is in need of help, the first factor is entitled to the greatest weight. The greater the nature and level of distress exhibited, the more likely the police involvement will be a reasonable exercise of the community caretaking function. This is not to say that the weight of the first factor alone will always be dispositive. In fact, the remaining three factors help to give more definition to the first factor. A particular level of exhibited distress may be seen as more or less serious depending on the presence or absence of the remaining three factors.[9]

In the case now before this court, Officer Nichols testified, in regard to the level of distress, that Appellant was driving below the posted forty-five mile per hour speed limit. Rather than testifying that this was an indication of distress, however, she testified that it was approximately 1:22 a.m. and that that was near the time the bars closed. Nichols was traveling on road FM 423,

[9] *Id.*

6

and she noticed a vehicle that was driving under the speed limit, the "posted speed limit is forty-five miles per hour, so anything under that usually is—kinda look at that vehicle twice." She explained that she was suspicious of a vehicle traveling under forty-five miles per hour in that area because "[t]hat area at that time of night can get a lot of people—a lot of bars start to close around the area. Could get a lot of people leaving the bars, and that would be why they might be driving under the speed limit."

Nichols testified that she first spotted Appellant's vehicle about a quarter of a mile away from any bar. She testified that other suspicious driving facts included his drifting within his lane and the sudden lane change from the right lane to the left lane and then, later, another lane change from the left lane to the right lane. She admitted, however, that Appellant signaled both lane changes.

After following Appellant's vehicle for two hundred to three hundred yards, she turned the car-mounted video on. She continued to follow Appellant and describe his car as drifting within its lane. Occasionally, the tires would hit the center line of the two-lane road. She had not turned her camera on until Appellant turned northbound on Highway 121. She testified that in her experience, "[U]sually when there's drifting in lanes, there's one of two things, either somebody has been traveling a lot and is tired or they're intoxicated."

7

When asked if she had seen any other cars that perhaps the driver of the vehicle was trying to avoid, Nichols said she did not recall any other vehicles at that time.

Appellant turned left on Paige Road, going back into the city. Nichols testified that he was going pretty much in a circle, and she found that suspicious. She claimed that at some point she saw Appellant's vehicle cross a yellow line separating the lane from the shoulder, and at some point she initiated a traffic stop. When asked why she stopped Appellant's vehicle, Nichols testified,

> After following the vehicle for a little while and observing the drifting and then the actual entire tires of the vehicle crossing over that line, I determined that it was probably—I probably needed to go ahead and make a traffic stop to check the welfare of the driver of the vehicle and make sure that everything was okay with the driver, whether he was intoxicated or a medical problem that he was having or something like that at the time.

Nichols also testified that she had no doubt as to whether she had reasonable suspicion to make the stop. When she activated her overhead lights, it took only thirty seconds for Appellant to stop.

There is no indication of how slowly Appellant was traveling. The only evidence is that it was below the forty-five mile per hour speed limit. There is no indication of the speed limit on Highway 121 or on any of the streets on which Appellant traveled while Nichols observed him, other than FM 423, and

8

no indication whether he traveled below or near the speed limit on the other streets. In analyzing the first factor, the evidence of distress is minimal and weighs against the State.

Concerning the second factor, nothing in the record indicates that Appellant was in an isolated area. Indeed, FM 423 is also known as Main Street in The Colony and Josey Lane south of the city limits, and Highway 121 is a major highway. The second factor is either neutral or weighs against the State.

Regarding the third factor, the record indicates that Appellant was alone in the automobile but that he was not in an isolated area, and, indeed, the record indicates that he was in a commercial area with businesses, albeit bars, still open. Officer Nichols, therefore, was not his sole access to assistance. The third factor is neutral.

The fourth factor, the extent to which the individual presented a danger to himself or to others if not assisted, weighs against the stop. Indeed, Officer Nichols admitted that Appellant posed no threat to others. He was sufficiently aware to signal lane changes, there was no indication that he failed to signal his turns, and he traveled in a distinct pattern, although Nichols found it suspicious.

9

Applying the *Corbin* factors, we conclude that Officer Nichols's exercise of her community caretaking function was not reasonable. There is no indication that Appellant appeared to be in danger of falling asleep, and indeed Nichols did not testify that that was her fear. Rather, she emphasized the suspicious nature of Appellant's actions. Accordingly, Appellant's "interest in being free from arbitrary government interference outweighed [the officer's] exercise of [her] community caretaking function."[10]

We must now determine whether there was reasonable suspicion to justify the stop.[11] A diagram of the area helps explain the driving pattern in addressing whether the driving pattern provided reasonable suspicion for a stop.[12] Appellant drove south on FM 423 (also known as Main Street and Josey Lane), east on Highway 121, a divided highway, left at the first exit, which was Paige Road, and then turned under Highway121 and drove back west on Highway 121.[13]

---

[10] *See id.* at 278.

[11] *See State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004) (providing that we must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case).

[12] *See* Appendix A.

[13] *See id.*

10

Nichols testified that she did not issue Appellant a ticket and that she probably would not have given him a ticket for any of his conduct described in her affidavit. After watching the video, we likewise conclude that Appellant committed no traffic violation; he just drove a route that she would not have taken. We hold that, without more, driving on a route that is not the most direct route to a destination does not provide reasonable suspicion to stop a person.[14]

Having given close attention to the videotape and considering the totality of the circumstances, including the entire record and all permissible inferences from the record, we hold that the officer did not have reasonable suspicion to stop Appellant.[15]

---

[14] *See Saenz v. State,* 842 S.W.2d 286, 289 (Tex. Crim. App. 1992) ("Although Mendoza stated Highway 67 was a primary route for smuggling operations, we do not believe appellant's mere presence on Highway 67 can be deemed suspicious merely because of a high incidence of smuggling in the area.").

[15] *See id.*; *State v. Huddleston*, 164 S.W.3d 711, 716 (Tex. App.—Austin 2005, no pet.) ("Witnessing Huddleston safely cross the fog line five times over a stretch of six miles did not give [the police officer] a reason to suspect that she was unsafely failing to remain in a single lane in violation of section 545.060 [of the transportation code]. The trial court did not err in concluding that the officer did not have a reasonable suspicion that section 545.060 was being violated.").

Because the officer did not have reasonable suspicion to stop Appellant and because her exercise of the community caretaking function was not reasonable, we hold that the trial court erred by overruling Appellant's motion to suppress. Consequently, we sustain Appellant's sole issue, reverse the trial court's judgment, and remand this case to that court for further proceedings consistent with this opinion.

LEE ANN DAUPHINOT
JUSTICE

PANEL B: DAUPHINOT, HOLMAN, and WALKER, JJ.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

DELIVERED: April 24, 2008

12

Appendix A



This is a rough, unscaled sketch of the area in which Appellant and Officer Nichols drove.  For a detailed map of The Colony, see, e.g., MAPSCO, INC, DALLAS STREET GUIDE 553-54 (2008).  Also see the maps at the city's website, http://www.ci.the-colony.tx.us.